Filed 2/5/19

OPINION AFTER TRANSFER FROM THE CALIFORNIA SUPREME COURT

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PETER JOHNSON et al.,<br><br>    Defendants and Appellants. | D071011<br><br>(Super. Ct. No. SCD258303) |

APPEALS from judgments of the Superior Court of San Diego County, Charles G. Rogers, Judge.  Affirmed, and remanded with directions.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant Peter Johnson.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant Ian Guthrie.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

In 2014, Lamar Canady was shot to death in broad daylight in the Oak Park neighborhood of the City of San Diego. After months of investigation by police, with the assistance of the Federal Bureau of Investigation (FBI) and authorities in Kansas City, Missouri, Peter Johnson and Ian Patrick Guthrie were arrested and eventually charged with murder (Pen. Code, § 187, subd. (a);[1] count 1) and assault with a semiautomatic firearm (§ 245, subd. (b); count 2) for Canady's death. The information also alleged that Johnson intentionally and personally discharged a firearm during the commission of the murder, causing death (§ 12022.53, subd. (d)) and that Johnson had a strike prior stemming from a 1998 murder conviction in Jamaica (§§ 667, subds. (b)-(i), 668, 1170.12). The information alleged Guthrie had a strike prior and serious felony prior stemming from a 1997 manslaughter conviction in New York (§§ 667, subd. (a)(1), 668, 1192.7, subd. (c)).

The investigation into Canady's death revealed Johnson and Guthrie were participants in a conspiracy to kill Canady led by drug kingpin Omar Grant.[2] Prosecutors alleged Grant ordered a hit on Canady, executed by Johnson with assistance from Guthrie and other uncharged coconspirators, to retaliate against Canady for stealing drugs from

---

[1]     Subsequent statutory references are to the Penal Code unless otherwise indicated.

[2]     Grant died after Johnson's and Guthrie's arrests and before trial.

2

Grant and sleeping with his girlfriend. After the trial, which was conducted jointly but with separate juries, Johnson and Guthrie were both convicted of first degree murder. Johnson's jury also found true the allegation that Johnson personally discharged a firearm resulting in Canady's death.

Johnson and Guthrie appeal their convictions on various grounds. Guthrie asserts: (1) The trial court erred by denying his motion to suppress statements made to police after he invoked his right to counsel during his postarrest interview; (2) insufficient evidence supported the prosecution's theory that he aided and abetted Canady's murder; (3) the trial court abused its discretion by admitting into evidence a rap song recorded by Canady prior to his death; (4) that even if the errors individually do not require reversal, cumulatively they do; and (5) that the trial court abused its discretion by denying the defendants' motion to continue the sentencing hearing to allow additional discovery concerning police use of a cell site simulator to locate him. Johnson asserts the trial court erred by failing to instruct on the lesser included offenses of second degree murder and voluntary manslaughter, and that the use of his Jamaican conviction as a prior strike ran afoul of his right to equal protection under the California and United States Constitutions. Both men also contend that the trial court abused its discretion by admitting into evidence testimony and documents concerning their illegal entry into the United States. We conclude these claims lack merit, and accordingly affirm both men's convictions.

Additionally, while the appeal was pending, we granted Johnson's motion to file a supplemental brief to explain the impact, if any, of newly enacted section 12022.53, subdivision (h) on his sentence. The amended provision allows the superior court, in the

3

interest of justice, to strike firearm enhancements. The Attorney General concedes the change in law applies to Johnson, but argues the record shows the court would not have struck the firearm enhancement even if it had had discretion to do so. Although we agree there is some support in the record for the People's position, section 12022.53, subdivision (h) was not effective when the trial court sentenced Johnson and the court lacked the discretion to strike the firearm enhancement.

After this opinion was originally issued on June 29, 2018, Johnson and Guthrie sought review in the Supreme Court. On October 31, 2018, the Supreme Court denied Johnson's petition for review, but granted Guthrie's petition and transferred the case back to this court with directions to vacate our decision and reconsider the cause in light of recently enacted Senate Bill No. 1393 (Stats. 2018, ch. 1013). We vacated our opinion and provided the parties with the opportunity to file supplemental briefs addressing the legislation.[3] As he did with the changes in 2018 to section 12022.53, the Attorney General concedes the law applies retroactively to this case but argues remand is futile because the record is clear that the court would not have struck the enhancement had it had discretion to do so. Although the trial court indicated it would not strike the serious prior felony enhancement even if it had the discretion to do so, Guthrie did not have the opportunity to address the question.

Thus, out of an abundance of caution, we remand the matter for the limited purpose of allowing the trial court to consider whether to strike the firearm sentencing

---

[3]     The parties were also provided with the opportunity to request additional time for oral argument, but declined to do so.

4

enhancement imposed on Johnson and to consider whether to strike the serious prior felony enhancement imposed on Guthrie.

FACTUAL AND PROCEDURAL BACKGROUND

Canady was murdered by a gunman in his barbershop in broad daylight at approximately 11:30 a.m. on May 9, 2014. The prosecution contended Grant, who led a drug trafficking operation, plotted revenge against Canady for stealing marijuana and sleeping with Grant's girlfriend, Talya Martin, over a year before the murder. According to prosecutors, Grant commissioned defendants Johnson and Guthrie, and other uncharged and unknown individuals, to murder Canady.

Investigative efforts after Canady's murder showed Johnson, a Jamaican citizen who resided in Kansas City, Missouri before the crime, began using a prepaid cell phone, or "burner," on April 15, 2014. Phone records showed Johnson activated the burner phone in Houston, Texas, that day, and that he was in San Diego by April 20th. The first name and phone number entered as a contact on the phone was Guthrie's. Guthrie also purchased multiple burner phones on May 5, 2014. Phone records revealed that Guthrie was in the area where Canady was shot and was in contact with Johnson on May 8, 2014.

May 9, 2014, the day Canady was killed, Guthrie called Grant around 9:18 a.m. Cell phone data showed Guthrie calling Johnson a few minutes later, then both men's phones moving toward the neighborhood where Canady's barbershop was located until Guthrie and Johnson were both in the area just minutes before the shooting. Around 11:00 a.m., the security cameras at the Trade Winds liquor store directly west of the barbershop captured Johnson walking down the street and entering the liquor store.

5

At that time, Canady was next door in the barbershop with one of his barbers, Pride Erving. Both Canady and Erving were known members of the West Coast Crips gang. Security footage from an auto repair business across the street from the liquor store, Nu's Auto Repair & Body Shop, showed Guthrie and a man in khaki pants standing near a silver sedan parked across from the barbershop. At one point in the video, Guthrie is seen raising his arms, hopping and shadow boxing.

At 11:22 a.m., Canady briefly walked outside the barbershop then reentered. Phone record showed Guthrie called Johnson within seconds of Canady returning inside the barbershop. The owner of the liquor store reported to the police that Johnson purchased a 40-ounce beer before leaving, and the time-stamped video footage from the store showed Johnson walking to the cash register after the call from Guthrie to purchase beer, then exiting the store at 11:24 a.m. At about the same time, a red SUV with a spare tire on the back of its lift gate proceeded down the street in the same direction as Johnson was walking.

As Johnson exited the liquor store, video from the auto shop showed Guthrie opening the silver sedan's trunk. The video then showed Guthrie's companion, referred to at trial as the man in khaki pants,[4] walk toward the silver sedan's open trunk and grab something from within. As Johnson exited the store, he and the man in the khaki pants walked towards each other, then the man in the khaki pants crossed the street toward Johnson and handed Johnson the item retrieved from the trunk in exchange for the bag

---

[4] The man was never clearly identified at trial.

containing the beer Johnson purchased at the liquor store. Prosecutors contended the man in the khaki pants exchanged the murder weapon for the beer Johnson purchased. Once the handoff was complete, the man in the khaki pants returned to the silver sedan and entered the passenger side of the vehicle.

The time-stamped video surveillance showed Johnson entering the barbershop at approximately 11:25 a.m. and exiting within seconds. In that short time, Johnson fired 14 shots, 10 of which hit Canady's head, face, torso, and legs. The video surveillance showed Johnson quickly leaving the shop, tucking the gun in his waistband, and running east, away from Guthrie and the man in khaki pants who had remained in the silver sedan. As soon as Johnson exited the barbershop, simultaneous video surveillance showed the sedan with Guthrie and the other accomplice inside driving away from the scene.

An employee of the auto shop, who was across the street from the barbershop at the time shots were fired, testified that he saw a man "turn real quick around the corner" while running away from the barbershop. The witness did not see if Johnson had a gun, but did recall something glinting off Johnson's back that appeared to be shaped "like a gun handle in back." The red SUV then circled the area, followed Johnson's movements and, according to a detective who analyzed the video surveillance, likely picked Johnson up. Johnson was also seen on video footage raising an arm to talk on the phone.

The silver sedan, driven by Guthrie, pulled away from the curb where it was parked, then drove east away from the barbershop, made a U-turn and paused in front of the barbershop for almost a minute before driving away. Cell phone records showed

Guthrie called Grant at 11:35 a.m. from an area just outside of the neighborhood where the shooting occurred.

Meanwhile, Erving exited the barbershop and was seen outside panting heavily and struggling to catch his breath. Erving entered the liquor store, and a customer called 911 to report the shooting and eventually put Erving on the phone, who reported to the dispatcher that his friend had been shot 15 times. Erving also called his friend, Mark Ritchey, in a panic and asked Ritchey to come pick him up. When Ritchey arrived, Erving was distraught and frantic.

San Diego Police Officer David Beathard was the first law enforcement official to arrive at the scene. Erving flagged Beathard down and exclaimed, "He is gone. They shot him like 15 times." Beathard entered the barbershop and found Canady lying on the floor in a pool of blood. Canady was pronounced dead at the scene and investigators found 14 cartridge casings, all fired from the same nine-millimeter Glock pistol.

Erving spoke with another officer about the shooting at the scene and consented to being swabbed for gunshot residue, photographed, and patted down. Once officers asked Erving to go back to police headquarters, however, he refused to answer any additional questions or cooperate further, and made himself unavailable to testify at trial.

An autopsy revealed Canady suffered 10 gunshot wounds, four to the front of his body and six to the back. One of the bullets entered the back of Canady's head and exited the left side of the top of his skull. That bullet was fired from a closer distance than the other bullets, likely 12 inches or less from Canady's head.

8

Officers eventually learned Johnson was in the Trade Winds liquor store next door to the barbershop immediately before the shooting, and his DNA and fingerprints were obtained from two beer cans in the liquor store that he had handled, but did not purchase. Police recovered surveillance video from the liquor store and the auto shop.

Police used the clothes Johnson was wearing—a dark blue American Eagle shirt with an "A-Eagle" emblem, a baseball cap, dark pants, a dark-colored wristwatch with a large face, and white Adidas shoes with black stripes—to identify him as the person who bought the beer and entered the barbershop immediately before the shooting. Once Johnson was identified, within weeks of the shooting San Diego police, with assistance from the FBI, requested a "cell tower dump" from major wireless carriers and used that data and the time of his call to Guthrie while in the liquor store to ascertain the numbers of the phone Johnson used, (832) 885-1563, and the phone Guthrie used, (619) 577-0114.

The cell phone records revealed that immediately after the shooting Guthrie's and Johnson's cell phones traveled from near the barbershop to a one block area on Via Monzon in the Rancho Peñasquitos neighborhood. Subpoenaed records for those phones also revealed that Guthrie's phone received or made over 100 calls from various Jamaican prefixes from May 8, 2014 to May 11, 2014. Cell phone records also revealed that on May 13, 2014, Johnson traveled from San Diego to Denver to Baltimore.[5]

Johnson's phone was eventually traced to Kansas City, Missouri. On August 13, 2014, San Diego authorities informed FBI officials in Kansas City that they had a search

---

[5] Police later confirmed that Johnson flew this route using information obtained from United Airlines.

9

warrant to track and trace the phone they believed Johnson was carrying there. Local authorities obtained phone records identifying the home where Johnson was staying and conducted surveillance for several days on the residence, eventually arresting Johnson on August 27, 2014, outside the home. When Johnson was arrested, he had the American Eagle shirt, watch, and Adidas shoes he wore the day of the shooting in his possession. Authorities also found his burner phone, which had Guthrie's phone number as the first phone number recorded in the phone's list of contacts.

On August 27, 2014, San Diego Police Officer Jim Jones interviewed Johnson in Kansas City. When shown a picture of Guthrie, Johnson told Jones that he was not sure if he knew Guthrie. Johnson admitted to shooting Canady, but denied that anyone else was involved with the crime. Johnson told Jones that the "support at the scene" that the video surveillance showed were just kids who wanted liquor.

Guthrie's phone was eventually traced back to 9881 Via Monzon, where officers conducted surveillance and saw Guthrie using the phone. After identifying Guthrie, San Diego police officers conducted a traffic stop and Guthrie produced a Florida driver license with the name Devon John. Officers later obtained a warrant to search the Via Monzon residence and discovered that it was being used as a marijuana stash house. The search of the house uncovered significant marijuana residue and packaging, a Taurus handgun, two extended round magazines, packaging materials, scales, fake identification cards, passport photos of multiple individuals, pay/owe sheets, tables with cuts on them, and multiple cell phones, one of which contained Guthrie's DNA. Officers also learned the house was leased to Talya Martin.

10

The same day that Johnson was arrested in Kansas City, San Diego police officers executed the search warrant for the Via Monzon house and arrested Guthrie, who was there. Guthrie was taken into custody and interviewed at the homicide office of the police department headquarters. Guthrie initially claimed to be Mike Smith from Brooklyn. When the officers showed photos of the crime scene and Johnson to Guthrie, he first denied being in the area or knowing anything about the shooting. He told the interviewing officers he was staying at the Via Monzon address because the person who lived there, Talya Martin, was vacationing.

Eventually, Guthrie admitted his real name. He insisted he lied about his name only because he entered the United States illegally in 2013. He also eventually admitted the Via Monzon house was used for packing marijuana and that he served as the "middle man" or runner for Grant. When shown a photo of Johnson again, Guthrie admitted he recognized him, knew him as "Boom," and that he bought 20 pounds of marijuana from him. Guthrie then changed his story, and said he was the seller and that he sent or gave weed to Johnson. Guthrie also told officers he bought the phone that he used to communicate with Johnson.

Guthrie eventually admitted that he knew more about Canady and the shooting, but told police he did not want to provide more information because he feared for the safety of his family in Jamaica. He admitted he and Johnson worked for Grant, who was also known as Razor. Guthrie maintained he was not involved in the shooting, but told officers Grant was upset with Canady for stealing Grant's marijuana and sleeping with Grant's girlfriend, Martin. Guthrie also eventually admitted to being in the neighborhood

11

where the shooting occurred, but claimed he was there to sell marijuana. When confronted with records of cell phone calls between him and Johnson, Guthrie stated the calls all related to drug deals.

Law enforcement also interviewed Martin, who initially told police she would not cooperate. The prosecutor, however, entered an immunity agreement with her. At trial, she told the juries that she and Grant, whom she called Razor, were in an on and off again relationship for several years. She did not live with Grant, but Grant paid for her apartment, car, clothing, purses, and all of her other expenses. In exchange, Martin would run errands for Grant, including receiving wired money, exchanging cash for prepaid credit cards, using fake identification to open post office boxes and retrieve packages, and renting houses for Grant, including the one on Via Monzon. Martin testified that she never lived at that house, but Guthrie did.

Martin was introduced to Guthrie by Grant, who referred to Guthrie as his family. She knew Guthrie as Shawn and by the nickname "Boxer" and one of her friends, Claudia Ambrose, formed a relationship with Guthrie around 2013. Martin testified that she and Grant would socialize with Guthrie and Ambrose regularly, including going on trips and frequent double dates.

Martin testified that in 2012 and 2013, she was also seeing Canady. At one point during this relationship, Martin agreed to store six storage bins of marijuana in her apartment for Grant while Grant was out of town. Martin stated that in the same time frame, approximately a year before Canady's death, Canady occasionally stayed with Martin at her apartment, including when the marijuana was stored there. On the last

12

occasion that Canady stayed the night, Martin woke up in the morning to find both Canady and the bins of marijuana gone. Martin called Canady, who denied taking the marijuana. Martin eventually told Grant what had happened, including that she had been in a relationship with Canady. Martin testified that she and Grant continued to be in a relationship for several years after the incident.

Martin testified she learned through social media that Canady had been killed. Martin did not suspect Grant was involved in the killing because two years had passed since Canady had stolen the bins, and because her relationship with Grant was going well. Several months later, in August 2014, Martin learned about the search warrant served at the Via Monzon house. At that time, she was in Jamaica with Grant. Martin had planned to return to San Diego the day after they learned of the search warrant, but she extended her trip for another three months. Martin also testified that Grant never returned to the United States from Jamaica and was murdered there on April 2, 2015.

After a three-week trial, Johnson's jury convicted him of first degree murder and found true the firearm enhancement allegation that he intentionally and personally discharged a firearm during the commission of the murder, causing death.[6] Several days later, Guthrie's jury returned its verdict, finding Guthrie also guilty of first degree murder.

Before sentencing, Johnson admitted he was convicted of murder in Jamaica but did not concede the conviction qualified as a strike prior. The trial court found the conviction qualified as a strike, sentencing Johnson to 50 years to life in prison on count

---

[6] The prosecution dismissed the charges for assault with a semiautomatic firearm (count 2) at the close of its presentation of evidence.

1, consisting of 25 years to life doubled under the "Three Strikes" law (§§ 667 and 1170.12), and to a consecutive second life term with a minimum of 25 years for the firearm enhancement. The court imposed a $10,000 restitution fine, ordered Johnson to pay a $40 court security fee, a $30 criminal conviction assessment, and $5,000 in victim restitution jointly and severally with Guthrie. The court sentenced Guthrie to 50 years to life, doubled under the Three Strikes law, plus another consecutive five years for the felony strike prior. The court imposed a $10,000 restitution fine, ordered Guthrie to pay a $40 court security fee, $30 criminal conviction assessment, and directed Guthrie to pay $5,000 in victim restitution jointly and severally with Johnson. Both men appealed.

DISCUSSION

I

*Failure to Instruct on Lesser Included Offenses*

Johnson first argues the trial court erred by denying his request for a jury instruction on the lesser included offense of second degree murder.

A. *Relevant Background*

Before closing arguments, counsel conferred with the court on jury instructions. Both Johnson's attorney and the district attorney requested an instruction on second degree murder. During the discussion, the trial court asked the attorneys "if a juror finds that Mr. [Johnson] or Mr. Guthrie was factually involved in the homicide, is there any way that they would find it other than premeditated? Is there any way a reasonable juror could find that other than premeditated?" The prosecutor responded, "I suppose the only argument a juror might entertain in their mind is that perhaps this was intended to

14

be . . . some type of drug deal, and when [Johnson] went in, something happened that he wasn't expecting and he ended up firing the gun and killing Mr. Canady."  The prosecutor then requested instructions on both first and second degree murder.

Guthrie's counsel next responded to the trial court's question, indicating the second degree instruction was required for his client since it was possible that the killing could have been the result of a drug deal gone awry, stating:  "We don't know really what happened from maybe the people in the car, the silver car's perspective, what was going to happen in the shop, let's say.  And so a killing ensues.  What kind of a killing is it?  And what are they aiding and abetting?  They leave, according to the theory of the prosecutor, and then they come back to see what the hell happened.  I heard shots.  Is that shots?  Let me go check that out.  They circle around and come back to see the fallout of it and are horrified by the fact that this just happened.  Because of her theory that the car is coming back and it is not the getaway driver at that point maybe . . . there was something, a struggle ensued . . . ."

Johnson's counsel then noted he was not planning to argue second degree murder during his closing argument, even if the jury were so instructed.  Johnson's counsel stated, "I don't think I have facts from my client without divulging what he has told me . . . to support making that argument."  He then stated that he would like the second degree instruction to provide the jury with more options, and to allow them to "split the baby."

After these arguments, the trial court initially indicated it would instruct on second degree murder "out of an abundance of caution."  But after hearing from defense counsel,

15

the court concluded it did "not have a duty to instruct on second as to [Johnson]," but permitted Johnson's counsel to revisit the issue after speaking with his client.  The court concluded the jury should be instructed on second degree murder as to Guthrie.

The following day, Johnson's attorney conceded there was not sufficient evidence to warrant any argument that Johnson's conduct constituted second degree murder, stating, "basically the way the evidence has come out in this case, there's really nothing that supports any finding that this was some sort of, you know, accidental, in terms of the way the evidence was presented, that either the government's theory is right or it isn't.  And that is that either, under their theory, that you planned to walk into the barbershop and execute Mr. Canady or you didn't.  There is really nothing that suggests that this was some sort of accident that unfolded."  The attorney then stated, "we can't ask for jury instructions that don't match any of the evidence."

After the court reminded Johnson's attorney to preserve potential issues for appeal, he requested the instruction for the record.  The trial court then formally denied the request, finding there was no substantial evidence to support an instruction on the lesser offense.

B. *Legal Principles*

Trial courts have a duty, even in the absence of a request, to instruct juries in criminal cases in those principles of law necessary to assist them in understanding the case.  (*People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Breverman* (1998) 19 Cal.4th 142, 154.)  Courts must instruct juries on lesser included offenses where there is substantial evidence from which a jury could conclude that the lesser offense was

16

committed and the greater offense was not.  (*People v. Cook* (2006) 39 Cal.4th 566, 596.)  "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive."  (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)

" ' "Homicide is the killing of a human being by another. . . ." '  [Citation.]  Criminal homicide is divided into two types:  murder and manslaughter.  'Murder is the unlawful killing of a human being, or a fetus, with malice aforethought.'  (§ 187, subd. (a).)"  (*People v. Beltran* (2013) 56 Cal.4th 935, 941.)  "A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder.  [Citation.]  'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' "  (*Id*. at p. 942.)

"Manslaughter is a lesser included offense of murder.  (§ 192; *People v. Thomas* (2012) 53 Cal.4th 771, 813.)  The mens rea element required for murder is a state of mind constituting either express or implied malice.  A person who kills without malice does not commit murder.  Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.  Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." '  [Citation.]  Heat of passion, then, is a state of mind caused

17

by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who acts without reflection in response to adequate provocation does not act with malice." (*People v. Beltran*, *supra*, 56 Cal.4th at p. 942.)

On appeal, we independently review the record to determine whether there is substantial evidence that could support a finding of guilt on a lesser offense. We do not assess credibility or decide whether a jury should convict on the lesser offense. Our concern is only whether the evidence is substantial such that a jury could reasonably choose the lesser of the offenses. (*People v. Manriquez* (2005) 37 Cal.4th 547, 587.)

C. *Analysis*

The trial court did not err by failing to give a second degree murder or voluntary manslaughter instruction to Johnson's jury. On appeal, Johnson asserts the instruction was warranted because there was evidence that the killing was not a coordinated hit, but merely a drug deal gone bad that erupted in gun fire. Specifically, Johnson points to the facts that (1) one of the auto shop employees heard two sets of gunshots, (2) Erving did not cooperate with police and got into a physical altercation with Canady's brother after the shooting, and (3) the abundance of evidence concerning Grant's marijuana operation.

Importantly, there is no evidence in the record showing any quarrel between Johnson and Canady or Erving. To the contrary, the video footage showed Johnson entering the barbershop and exiting just 16 seconds later, indicating there was no time for a drug deal to go south, or another type of dispute to erupt. In addition, there was no

18

evidence that Canady or Erving were armed or that Johnson felt his own life was in danger. All the bullets collected from the shooting were fired from the same gun. With respect to the auto shop employee's testimony that there was a gap in time between two sets of gunfire, there was no specific testimony concerning the length of that gap. The employee stated only that he heard shots, then got up from the outdoor table he was eating at to see if an engine had backfired, then sat back down and heard more shots. This evidence does not show a jury could have reasonably concluded Johnson acted without malice or in the heat of passion.

The other two facts that Johnson points to, an altercation between Canady's brother and Erving and the drug operation found at the Via Monzon house, are equally insufficient to show the instruction was required. Neither fact showed there had been a drug deal involved or any altercation at the scene of the murder. Simply put, there was no evidence before the court that supported that theory. Indeed, the evidence of Grant's drug operation at the Via Monzon house supported the prosecution's theory that the killing was in retaliation for Canady stealing drugs from Grant. There was no evidence that tied the drug operation at that house to Canady's death.

Likewise, Johnson fails to identify any specific evidence tying Erving's conduct to his theory that Johnson did not intend to kill Canady in the 16 seconds he was in the barbershop. With respect to Erving's unwillingness to cooperate with the police, Johnson argues that "jurors reasonably could have concluded that Erving followed an armed shooter out of the barbershop and tried to leave the scene because he needed to take something out the barbershop [for instance money, marijuana or guns] before the police

19

arrived."  However, there was no evidence that Erving did so.  Clear video footage showed Erving exiting the barbershop empty handed and there was no evidence that there was any contraband recovered from the barbershop or Erving.

Further, Johnson's defense at trial was that he was not the shooter.  His attorney argued that the "gunshots started happening before [Johnson] ever even walked into" the barbershop, and suggested that Erving was the perpetrator.  Johnson's own statements to police, however, showed he was hired to kill Canady and did so deliberately.  The jury heard Johnson tell police that the killing was retaliation—"he [Canady] the one that did what he did. . . .  He is the right guy [to kill]"—and that to find Canady, Johnson and his coconspirators "do our homework like you guys do."

The evidence Johnson now marshals on appeal to support his claim of instructional error was not sufficient " 'to deserve consideration by the jury.' "  (*People v. Barton, supra*, 12 Cal.4th at p. 201, fn. 8.)  These facts were not "evidence that a reasonable jury would find persuasive" to show Johnson committed a lesser included offense to first degree murder.  (*Ibid.*)  The trial court's failure to instruct on second degree murder or manslaughter was not error.

II

*Admission of Fraudulent Identification Evidence*

Johnson and Guthrie contend the trial court erred by denying their motions to exclude false identification documents seized from their homes.

A. *Relevant Background*

20

Johnson and Guthrie are both Jamaican nationals who used fake birth certificates and driver licenses from the Virgin Islands to illegally enter the United States. Both birth certificates were similar in terms of templates, printer marks, and false content. Both certificates, for example, stated that they were born in Christiansted on the island of St. Croix. Both listed their mother's first name as "Sonia" and their doctor's first name and middle initial as "Marc K." Both doctors' signatures also resembled each other.

Guthrie's attorney moved to exclude the documents as "highly prejudicial and inflammatory," specifically as "to the illegal immigration issue," which he argued was "highly inflammatory in politics . . . ." Johnson's attorney added that the evidence only tenuously connected the defendants to each other and that the prosecution had other more persuasive evidence tying them together. He argued that because of this, the prejudicial nature of the evidence outweighed its probative value.

In response, the prosecutor agreed not to elicit testimony that the defendants were illegal immigrants, but opposed the motion with respect to the documents. She argued the similarities in the forgeries suggested a common manufacturer, which was highly relevant to the theory of her case, specifically the defendants' conspiratorial relationship. In denying the defendants' motion, the court emphasized the importance of the fraudulent documents to the prosecution's conspiracy theory and found that their probative value outweighed the potential prejudice to the defendants. The court also acknowledged the prosecutor's agreement to avoid testimony relating to immigration status and stated it would sustain any objections to testimony of that nature.

21

The topic of the defendants' immigration status was also at issue with respect to Guthrie's motion to exclude specific statements he made during his police interview about his immigration status. When he was arrested, Guthrie initially gave detectives a false name and told them he was from Brooklyn, New York. During the interview, Guthrie eventually admitted he had given the police a false name but told them he had only done so because he was in the country illegally and feared deportation.

In denying Guthrie's motion to exclude those statements, the court stated "I don't want the people trying to argue that his illegal entry is in some fashion relevant either to his credibility, which it is, but I am not going to let that argument, or to whether he committed this crime. But having said that, the fact that he was in the country illegally is going to go before jurors." The court also stated it did not want the prosecution to raise any immigration hold that might have been in place, but noted the defense was free to argue that the only reason they had fraudulent documents was to illegally enter the United States.

The fraudulent identification documents were introduced by the prosecution through the testimony of Florida Highway Patrol Master Sergeant Spencer Ross, who investigated identity theft and fraudulent identification operations in Florida. Ross testified that the defendants' fake names were on a list of 300 people who may have obtained fraudulent Florida driver licenses relying on false Virgin Island documents. Ross also testified that the Virgin Islands government never found a driver license or birth record for Johnson's false name, Derrick Brown. Ross stated that in his opinion, the common features of the defendants' fraudulent birth certificates suggested that they were

22

generated by the same person or group.  He also testified that Johnson's and Guthrie's fake licenses were issued about two months apart.

B. *Legal Principles and Analysis*

The admission of evidence is in general governed by Evidence Code sections 210, 351, and 352.  Evidence Code section 351 states:  "Except as otherwise provided by statute, all relevant evidence is admissible."  Evidence Code section 210 defines relevant evidence as "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  Although all relevant evidence is admissible, Evidence Code section 352 gives a trial court discretion in excluding some otherwise admissible evidence:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"We review a trial court's decision to exclude evidence for abuse of discretion. (*People v. Linton* (2013) 56 Cal.4th 1146, 1181.)  The decision to exclude evidence 'will not be disturbed except on a showing [that] the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation].' "  (*People v. Peoples* (2016) 62 Cal.4th 718, 745.)

Johnson and Guthrie do not contend that Ross's testimony concerning their fraudulent identification was irrelevant, only that it was unfairly prejudicial because it referenced their immigration status.  Specifically, they assert the introduction of their

23

false identification documents was inflammatory and extremely prejudicial because "caselaw in California and in other jurisdictions 'have recognized the strong danger of prejudice attendant with the disclosure of a party's status as an undocumented immigrant.' "  The case Johnson quotes for this proposition, *Velasquez v. Centrome, Inc.* (2015) 233 Cal.App.4th 1191, however, supports the opposite outcome he and Guthrie advance.  In *Velasquez*, the Court of Appeal overturned the defense judgment in a personal injury lawsuit where the plaintiff's immigration status was disclosed during voir dire, but was entirely irrelevant to the claims at trial.  Unlike *Velasquez*, here there is no dispute that the evidence at issue—that the defendants obtained false identification through the same fraudulent channel—was relevant to show Johnson and Guthrie were part of the conspiracy with Grant to murder Canady.[7]

The record is clear that the trial court considered the potentially prejudicial effect of the evidence and limited the presentation of that evidence to minimize its inflammatory character.  Further, the prosecution did not use the defendants' immigration status to insinuate criminal proclivity or challenge the defendants' credibility.  In fact, federal immigration crimes specifically were raised for the first time by *Guthrie's* attorney during her cross-examination of Ross.  On redirect, the prosecutor then asked, "did you learn anything about any citizenship or background that seemed to be consistent

---

[7]     Johnson also argues that the probative value was low because Ross's testimony showed the fraudulent identification scheme involved 300 individuals and Guthrie's and Johnson's false driver licenses were issued two months apart in different counties in Florida.  This information goes to the weight of the evidence, and does not diminish its probative value to the point that it is substantially outweighed by prejudicial effect.

24

throughout your investigation" into the false identification scheme. Ross replied that all the individuals that obtained fraudulent identification were not lawful citizens of the United States and were uniformly from Jamaica.

Ross's testimony was relevant to the crimes at issue, and the trial court did not abuse its discretion by finding the evidence's probative value was not substantially outweighed by any potential prejudicial effect.

### III

### *Johnson's Prior Jamaican Conviction*

Johnson next alleges the trial court erred by finding his Jamaican murder conviction qualified as a strike prior. He asserts that because a defendant in Jamaica can potentially be convicted of murder by nine members of an 11-person jury, and not a unanimous 12-person jury, use of the conviction to enhance his punishment violates his right to equal protection under the law.

A. *Relevant Background*

The information alleged Johnson's 1998 conviction for murder in Jamaica constituted a prior strike. At the initial sentencing hearing, Johnson admitted he was convicted of murder in Kingston County, Jamaica, but did not concede the conviction qualified as a strike prior under California law. The prosecution filed a sentencing brief asserting the elements of murder in Jamaica were the same as those in California and explaining the legal system was constitutionally sound. At a subsequent sentencing hearing, the court compared Jamaica's law with section 187 and concluded the elements were the same. The trial court also stated it had considered whether Jamaica's "guilt-

25

determining process" was "incompatible with the fundamental principles reflected by [the] constitution" and had concluded that "Jamaica's legal system adheres to our fundamental constitutional principles." The court then found that Johnson's foreign conviction qualified as a serious and violent felony under California law.

The court then invited counsel to argue if the prior conviction should be stricken under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. Johnson's attorney responded that Johnson "is 49 years old" and the "reality of it, it is frankly academic because given the time that he is facing" even if he were paroled, "he would be extradited to Jamaica to serve out the remainder of the murder sentence there . . . ." Johnson's attorney then stated he would rest on the pleadings. The trial court concluded striking the prior conviction was not appropriate. The court noted that Johnson had a strong affection for his family, but the nature of the current offense, and the fact he was previously convicted for murder and escaped from prison in Jamaica made it an inappropriate case to dismiss the strike.

B. *Legal Principles*

"For criminal sentencing purposes in this state, the term 'serious felony' is a term of art. Severe consequences can follow if a criminal offender, presently convicted of a felony, is found to have suffered a prior conviction for a serious felony." (*People v. Warner* (2006) 39 Cal.4th 548, 552.) If the present conviction is also for a serious felony, "the offender is subject to a five-year enhancement term to be served consecutively to the regular sentence." (*Ibid.*) A prior conviction for a serious felony also "renders the

26

offender subject to the more severe sentencing provisions of the three strikes law." (*Ibid.*)

"The Legislature has provided in section 668: 'Every person who has been convicted in any other state, government, country, or jurisdiction of an offense for which, if committed within this state, that person could have been punished under the laws of this state by imprisonment in the state prison, is punishable for any subsequent crime committed within this state in the manner prescribed by law and to the same extent as if that prior conviction had taken place in a court of this state.' . . . . According to the plain meaning of this text, a conviction in another jurisdiction may be used if the same 'person' could have been punished by imprisonment for the same conduct had it been committed in this state." (*People v. Trevino* (2001) 26 Cal.4th 237, 241-242 (*Trevino*) italics omitted.)

"Whether a crime qualifies as a serious felony is determined by section 1192.7, subdivision (c), which lists and describes dozens of qualifying crimes, including murder, robbery, kidnapping, and forcible sexual assaults. [Citation.] 'Under our sentencing laws, foreign convictions may qualify as serious felonies, with all the attendant consequences for sentencing, if they satisfy certain conditions. For a prior felony conviction from another jurisdiction to support a serious-felony sentence enhancement, the out-of-state crime must "include[] all of the elements of any serious felony" in California. (§ 667, subd. (a)(1).) For an out-of-state conviction to render a criminal offender eligible for sentencing under the three strikes law (§§ 667, subds. (b)-(i), 1170.12), the foreign crime (1) must be such that, "if committed in California, [it would

27

be] punishable by imprisonment in the state prison" (§§ 667, subd. (d)(2), 1170.12, subd. (b)(2)), and (2) must "include[] all of the elements of the particular felony as defined in" section 1192.7(c) (§§ 667, subd. (d)(2), 1170.12, subd. (b)(2)).' " (*People v. Navarette* (2016) 4 Cal.App.5th 829, 842.)

Thus, a foreign offense that includes all elements of a California qualifying felony can establish a strike prior and a serious felony prior. (See *People v. Woodell* (1998) 17 Cal.4th 448, 453; *People v. Myers* (1993) 5 Cal.4th 1193, 1200-1201 (*Myers*).) In determining whether the foreign prior contains the elements of the California felony, the trier of fact may not look outside the record of conviction, but may consider any evidence in the record of the foreign conviction "if not precluded by the rules of evidence or other statutory limitation[s]." (*Myers,* at p. 1201; see also *People v. Riel* (2000) 22 Cal.4th 1153, 1204-1205.)

C. *Analysis*

Johnson does not dispute that the elements of murder in Jamaica are aligned with section 187. He argues, however, that his prior conviction does not qualify as a serious prior felony or a strike prior because the Jamaican legal system allows a murder conviction by a jury of 11, and not 12, if a juror dies or is "discharged by the Court through illness or other sufficient cause," and allows for conviction when nine jurors are in agreement. Johnson contends that because article 1, section 16 of the California Constitution provides a criminal defendant with a right to be tried by an impartial and

28

unprejudiced jury of 12 and requires a unanimous verdict, his right to equal protection under the United States Constitution is violated by the use of the Jamaica conviction.[8]

" ' "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." ' " (*In re Lemanuel C.* (2007) 41 Cal.4th 33, 47.)  To prevail on an equal protection claim, the defendant must show (1) the state has adopted a classification that affects two or more similarly situated groups in an unequal manner, and (2) the challenged classification does not bear a rational relationship to a legitimate state purpose.  (*People v. Hofsheier* (2006) 37 Cal.4th 1185, 1200.)  When determining whether two persons are similarly situated, the court does not inquire whether they are similarly situated for all purposes, but whether they are similarly situated for purposes of the law challenged.  (*Id*. at pp. 1199-1200.)

Under the recidivist statutes at issue, to determine if a foreign conviction qualifies the defendant for increased punishment, the relevant inquiry is " 'whether the offense of which the defendant was convicted in [the foreign jurisdiction] includes the elements of first or second degree murder in California such that the [foreign] offense was one which had the capacity for punishment as first or second degree murder.' " (*People v. Martinez* (2003) 31 Cal.4th 673, 681, italics omitted.)  The recidivist laws do not look to the process by which the conviction was obtained, but rather to the elements of the crime for

---

8    The Attorney General argues as an initial matter that Johnson waived this issue because it was not raised in the trial court.  We agree the issue was forfeited, but exercise our discretion to consider the claim to avoid a later challenge to the judgment on the basis of ineffective assistance of counsel.

29

which the defendant was convicted. As discussed, a foreign conviction may form the basis for a prior felony enhancement or strike if the crime " 'includes all of the elements of any serious felony' in California." (*People v. Navarette, supra*, 4 Cal.App.5th at p. 842; §§ 667, subd. (d)(2), 1170.12, subd. (b)(2).)

While no California opinion has explored whether the process afforded in a foreign jurisdiction must meet California's own constitutional requirement of 12 unanimous jurors for a conviction, we agree with the Attorney General that the California Supreme Court's decision in *People v. Andrews* (1989) 49 Cal.3d 200 (*Andrews*) provides useful guidance and supports the conclusion that a prior foreign conviction can form the basis for a sentencing enhancement, even if the foreign jurisdiction did not afford the same procedural protections available to a defendant in California.

In *Andrews*, the defendant was convicted of first degree murder. The jury found true the special circumstance allegation under section 190.2, subdivision (a)(2) that he had been previously convicted of murder, which made the defendant eligible for the death penalty and life in prison without the possibility of parole. (*Andrews, supra,* 49 Cal.3d at p. 221.) The defendant was 16 when he committed the prior offense in Alabama, "where he was charged and convicted as an adult. Under Alabama law at the that time, minors 16 to 18 years old came within the original jurisdiction of the adult criminal court. . . . Had defendant committed the murder in this state, California law would have permitted his being tried as an adult only if a juvenile court had [first] found him unfit . . . ." (*Ibid.*) The defendant argued he was denied equal protection under the federal and state Constitutions because he was treated differently than capital defendants who had

30

committed murder at the age of 16 in California, who would have been entitled to a fitness hearing. (*Id*. at p. 223.)

The Supreme Court summarily rejected this assertion, stating "[i]n no two states is the process by which a conviction is obtained identical. This does not mean, however, that a violation of equal protection results when a conviction from a foreign jurisdiction and a California conviction for the same offense are accorded equal weight . . . ." (*Andrews*, *supra*, 49 Cal.3d at p. 224.) The court continued, "[w]e conclude that, as long as the guilt ascertainment process in the foreign jurisdiction is not in and of itself constitutionally flawed, there is no constitutional bar against treating a murder conviction from a foreign state in the same manner as a California conviction for the same offense." (*Ibid*.)

Johnson argues that unlike the prior conviction in *Andrews*, his Jamaican conviction does not pass constitutional muster in California because our Constitution requires a unanimous jury of 12 for a criminal conviction.[9] Because not all foreign jurisdictions provide the same procedural protections as California's constitution, he argues defendants with foreign convictions are treated in an unequal manner. However, "[t]o accept defendant's statutory construction would mean that every time the prosecution alleged a murder conviction from a foreign jurisdiction, the trial court must

_____

[9]    There is no dispute that the federal Constitution does not impose these requirements. (See *Williams v. Florida* (1970) 399 U.S. 78, 100 ["the 12-man requirement cannot be regarded as an indispensable component of the Sixth Amendment"]; *Johnson v. Louisiana* (1972) 406 U.S. 356, 359 [" '(i)n criminal cases due process of law is not denied by a state law . . . which dispenses with the necessity of a jury of twelve, or unanimity in the verdict' "].)

31

determine whether the guilt ascertainment procedures of that jurisdiction afforded the same procedural protections as those in California." (*Andrews*, *supra*, 49 Cal.3d at p. 222.) In *Andrews*, the court held plainly that it did "not read such a requirement into the [analogous language in the death penalty] statute." (*Ibid.*)

In reaching this conclusion, the *Andrews* opinion used "a jury consisting of fewer than 12 persons" as one example of a procedure that is required in California, but the absence of which would not preclude a foreign conviction from forming the basis for a sentence enhancement under section 190.2. (*Andrews, supra*, 49 Cal.3d at p. 223.) The court noted that such "procedural differences might conceivably spell the difference between a murder conviction and some other result," but concluded neither the language of section 190.2 nor its legislative history showed that the Legislature or the electorate "intended that the prosecution's ability to use convictions from other states should turn on such questions." (*Andrews,* at p. 223.) The court held the intent of the statute "was to limit the use of foreign convictions to those which include all the elements of the offense of murder in California, and [that the] defendant . . . failed to show otherwise." (*Ibid*.)

As stated, Johnson does not dispute that the elements of murder in Jamaica are aligned with the elements of murder in California. Nor does he contend that he could not have been convicted of murder if he had committed the crime in California. Because the recidivist sentencing provisions at issue look exclusively to the elements of the crime to determine their application, we reject Johnson's assertion that the laws treat defendants with convictions from foreign jurisdictions differently than those who are charged and convicted in this state. In other words, the dichotomy that Johnson has set up between

himself and those with prior murder convictions obtained in California is a false one. (See *People v. Johnson* (1991) 233 Cal.App.3d 1541, 1549-1550 [rejecting claim that Nevada conviction for burglary could not serve as basis for prior serious felony because "Nevada law did not allow him the same procedural protections he would have enjoyed in California"].)  Contrary to Johnson's assertion, the two types of defendants are treated equally so long as the crime at issue is the same in both jurisdictions.[10]

---

[10]     Johnson also relies on *Trevino, supra*, 26 Cal.4th 237 to support his argument that *Andrews* is not applicable here, but his reliance is misplaced.  *Trevino* held that it is the prior *offense* that establishes whether the defendant is eligible for the death penalty or a life sentence without the possibility of parole under section 190.2, subdivision (a), and not the particular characteristics of the defendant at the time he committed the offense. (*Trevino,* at p. 244.)  In *Trevino*, the defendant committed a prior murder at age 15 in Texas where he was tried as an adult.  (*Ibid*.)  Had the crime occurred in California he would have been tried as a juvenile and, on appeal, the defendant argued this distinction precluded the use of the conviction as the basis for enhanced punishment under section 190.2.  (*Trevino,* at p. 239-240.)  In rejecting this argument, the *Trevino* court distinguished the statutory language of section 668 from that of section 190.2, noting that "section 668 would permit consideration of a defendant's age in determining whether *that defendant* could have been imprisoned for the same conduct in California."  (*Trevino,* at p. 241-242.)  In drawing this distinction the court pointed to the statutory language of section 668, which provides, " 'Every person who has been convicted in any other state, government, country, or jurisdiction of an offense for which, if committed within this state, *that person* could have been punished under the laws of this state by imprisonment in the state prison, is punishable for any subsequent crime committed within this state in the manner prescribed by law and to the same extent as if that prior conviction had taken place in a court of this state.' "  (*Trevino,* at p. 241, quoting § 668.)  In contrast, section 190.2 stated, " 'For the purpose of this paragraph, an offense committed in another jurisdiction, which if committed in California would be punishable as first or second degree murder, shall be deemed murder in the first or second degree.' "  (*Trevino,* at p. 241.)  We do not agree with Johnson that this distinction is relevant to the determination in this case.  Unlike the defendant in *Trevino*, Johnson points to no personal characteristic that would have precluded a conviction in California had the murder he committed in Jamaica occurred in this state.

Further, and critically, Johnson has not shown that his conviction was in fact deficient under California's Constitution. (See *People v. Tassell* (1984) 36 Cal.3d 77, 92 [Rejecting defendant's claim that prior conviction under Florida law improper basis for sentencing enhancement because "the documentation submitted by defendant [was] insufficient to support his claim that he was not advised of his rights against self-incrimination and to confront and cross-examine witnesses at the time he entered his guilty plea."].) Johnson has presented no evidence from his prior trial that shows his conviction was obtained by anything less than 12 unanimous jurors.

Even if we were to conclude that the two groups of defendants are treated differently, however, Johnson has also not shown the state lacked an appropriate basis for differing treatment. The challenged classification bears a rational relationship to the legitimate state purpose of imposing greater punishment on offenders who have shown a propensity to repeat their violent crimes, regardless of where those crimes occurred. (See § 667, subd. (b) ["It is the intent of the Legislature . . . to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of one or more serious and/or violent felony offenses."]; *People v. Superior Court* (2014) 225 Cal.App.4th 1007, 1016 [The purpose of the Three Strikes law is " ' "to ensure longer prison sentences and greater punishment for those who commit a felony and have been previously convicted of serious and/or violent felony offenses" ' [citation] and 'to promote the state's compelling interest in the protection of public safety and in punishing recidivism.' "].) For these reasons, we reject Johnson's claim that the use of his Jamaican conviction resulted in a violation of his constitutional rights.

34

IV

*Guthrie's Motion to Suppress His Statements to Police*

Guthrie contends that statements he made to police on August 27, 2014, after his arrest were obtained in violation of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Guthrie asserts he unequivocally invoked his right to counsel during the interview, and that all of the statements made after that invocation were improperly admitted at trial. We disagree.

A. *Relevant Background*

On August 27, 2014, Detective Gary Avalos arrested Guthrie at the Via Monzon residence. Avalos and San Diego Police Sergeant Greg Flood questioned Guthrie in an interview room at the police headquarters furnished with recording equipment. Video footage of the interview was played for the jury. After asking Guthrie basic identifying information, Avalos read Guthrie his *Miranda* rights. Avalos then asked Guthrie if he understood those rights and if he was willing to talk. Guthrie responded "Yeah…I, I…yeah cause I want to, I want to know what this is about." Flood then explained that if Guthrie was not a United States Citizen he also had the right to speak with his consulate. Guthrie did not assert his rights.

Avalos and Flood then continued questioning Guthrie, primarily about his relationship with Ambrose and Martin, Guthrie's whereabouts, and his identity. Avalos showed Guthrie a photo of Johnson from the liquor store's surveillance camera and asked Guthrie who the man was. Guthrie denied knowing the man or being at the scene of the murder. Avalos showed Guthrie a copy of a Florida driver license with his name and

35

picture, and Guthrie finally admitted his identity and told the officers he did not disclose his name because he was in the United States illegally. Avalos then pressed Guthrie to admit he was at the scene of the murder and Guthrie repeatedly denied it, eventually stating, "Then charge me, sir. A lawyer, lawyer."[11] Flood then stated: "I mean do you want to talk to a lawyer?" Guthrie responded: "Yeah, yeah. Do, do I, if anything…" The colloquy continued: "FLOOD: We want to continue to talk to you. Do you want to continue to talk to us or do you want to talk to a lawyer. [¶] GUTHRIE: Listen, listen. If you're gonna charge me, charge me. If not, let me go. Or, or call . . . immigration and say I'm here illegally. [¶] FLOOD: Well, you're under arrest right now. [¶] GUTHRIE: Yeah. [¶] FLOOD: So, you understand that. [¶] GUTHRIE: Yeah. [¶] FLOOD: Okay. ¶ GUTHRIE: Okay, okay. You, you, but you read me my rights, but what I under arrest for? [¶] FLOOD: Right now you're under arrest for murder."

Flood continued the questioning, telling Guthrie they knew he was not the gun man, but they knew he was at the scene and involved in the murder. Guthrie continued to deny he was at the scene and maintained he did not know anything about Johnson. Avalos asked Guthrie to give him information about his connection to Ambrose, but Guthrie declined and said, "I'm, I'm not speaking no more man. Because I don't know that dude [referring to Johnson], man." Avalos pressed Guthrie to continue to provide information to help himself out if what he was saying was true. The interview then continued for over another hour. Guthrie continued to deny any involvement in the

---

11    The transcript of the interview contains an error and states instead, "Then charge me sir. *I, I can get* a lawyer." (Italics added.)

shooting, but admitted he was involved in drug sales with Grant and eventually provided information about the motive for the killing, telling Avalos and Flood that Canady had robbed Grant and slept with Martin.

Before trial, Guthrie moved to suppress the videotaped interview. At the hearing on the motion, Guthrie's attorney asserted that by stating, "yeah, yeah" in response to Flood's question, "do you want to talk to a lawyer," Guthrie invoked his right to counsel. The prosecutor argued Guthrie's words were ambiguous because he uttered the phrase "yeah, yeah" constantly throughout the interview, and that it was reasonable for Flood and Avalos not to perceive it as a clear request for an attorney. The trial court found that Guthrie made a free and knowing waiver of his right to an attorney at the beginning of the interview, and that Guthrie did not "make an unequivocal, unambiguous assertion of [that] right[] in order to revoke that waiver."

B. *Legal Principles*

As a safeguard to protect a suspect's Fifth Amendment privilege against self-incrimination, the United States Supreme Court requires law enforcement agencies to advise a suspect, prior to any custodial questioning, "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." (*Miranda, supra*, 384 U.S. at p. 479; *People v. Martinez* (2010) 47 Cal.4th 911, 947 (*Martinez*).) Before admitting a defendant's incriminating statements into evidence, the prosecution must demonstrate

37

"the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." (*Miranda*, at p. 475.)

After a knowing and voluntary waiver of the rights to remain silent and to the presence and assistance of counsel, law enforcement may continue questioning the suspect until and unless the suspect clearly and unambiguously invokes these rights. (*Davis v. United States* (1994) 512 U.S. 452, 461 (*Davis*).) An *unambiguous* request for counsel or refusal to talk bars further questioning (*People v. Cruz* (2008) 44 Cal.4th 636, 668 (*Cruz*)) and the interrogation must end (*Miranda, supra*, 384 U.S. at p. 474).

If a suspect makes an ambiguous statement that could be construed as an invocation of his *Miranda* rights, a different standard applies. A statement is ambiguous when a reasonable officer, in view of the totality of the circumstances, would have understood "only that the suspect might be invoking the right" to remain silent or to the assistance of counsel. (*People v. Williams* (2010) 49 Cal.4th 405, 428 (*Williams*).) "[O]fficers may, but are not required to, seek clarification of ambiguous responses before continuing substantive interrogation." (*Id*. at p. 427, italics omitted; see *Martinez*, *supra*, 47 Cal.4th at p. 949 [the same rules apply to invocations of the right of counsel and the right to remain silent].)

"In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends. In those instances, the protective purpose of the *Miranda* rule is not impaired if the authorities are permitted to pose a limited number of followup questions to render more apparent the true intent of the

defendant." (*Williams*, *supra*, 49 Cal.4th at p. 429.) Although officers are not required to clarify what may be a post waiver invocation, " 'it will often be good police practice for the interviewing officers to clarify . . . .' whether the right was being invoked." (*Martinez*, *supra*, 47 Cal.4th at p. 947, quoting *Davis*, *supra*, 512 U.S. at p. 461.)

"In evaluating the voluntariness of a statement, no single factor is dispositive. [Citation.] The question is whether the statement is the product of an ' "essentially free and unconstrained choice" ' or whether the defendant's ' "will has been overborne and his capacity for self-determination critically impaired" ' by coercion. [Citation.] Relevant considerations are ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*Williams*, *supra*, 49 Cal.4th at p. 436.)

This court conducts an independent review of the trial court's legal determination of the post waiver invocation of a *Miranda* right, relying upon the trial court's factual findings, if supported by substantial evidence. (*Williams*, *supra*, 49 Cal.4th at p. 425.)

C. *Analysis*

We agree with the trial court that Guthrie's statements to Avalos and Flood after he initially waived his right to counsel did not constitute an invocation of his right to counsel and against self-incrimination. Guthrie does not contest the fact that he initially waived his right to counsel immediately after Avalos read him his rights.[12] Thus, to invoke his rights during the interview, Guthrie needed to unambiguously request an attorney. (See *Cruz, supra*, 44 Cal.4th at p. 668.)

Approximately 30 minutes into the close to two and a half hour interrogation, Guthrie grew frustrated with the officers' repeated accusation that he was at the scene of the crime. In response to their repeated statements that they knew Guthrie was near the barbershop when the shooting occurred, Guthrie stated in a frustrated tone, "[t]hen charge me, sir. A lawyer, lawyer." To clarify if Guthrie was invoking his right to representation, Flood asked a follow up question, "do you want to talk to a lawyer?" Guthrie responded by saying, "Yeah, yeah. Do, do I, if anything. . . ." This statement was objectively ambiguous because from the start of the interrogation, Guthrie responded to almost every statement and question posed by Avalos and Flood by saying, "yeah, yeah."

---

[12] Because Guthrie initially waived his right to counsel, his heavy reliance on *Smith v. Illinois* (1984) 469 U.S. 91 (*Smith*) is misplaced. *Smith* explicitly considered only the threshold inquiry of "whether [the defendant] invoked his right to counsel in the first instance." (*Id*. at p. 95.) Not the invocation of the right after an initial waiver at issue here.

Flood, reasonably, then sought further clarification, stating, "We want to continue to talk to you. Do you want to continue to talk to us or do you want to talk to a lawyer?" Guthrie again did not unambiguously invoke his rights, stating only, "If you're gonna charge me, charge me. If not, let me go. Or, or call . . . immigration and say I'm here illegally." Flood explained that Guthrie was under arrest and that he was being charged with murder. The interrogation then continued without any further statement from Guthrie about his rights.

Guthrie contends that his statement, "yeah, yeah," to Flood's first question was an unambiguous invocation of his rights. We disagree. The trial court's finding that the statement was ambiguous was supported by the evidence before the court. Because of Guthrie's speech patterns, specifically his habit of stating "yeah, yeah" in response to most of the questions Avalos and Flood asked, it was reasonable for the officers to understand only that Guthrie might be invoking his right to assistance of counsel and to seek further clarification. (*Williams*, *supra*, 49 Cal.4th at 428.) Guthrie then failed to signal a clear request for a lawyer and the interrogation properly continued. The trial court's denial of Guthrie's motion to suppress was not error.

V

*Sufficiency of the Evidence to Support Guthrie's Conviction for First Degree Murder*

Guthrie next contends that the evidence at trial was insufficient to support his conviction for aiding and abetting, or conspiring to commit, first degree murder. He argues that all of the evidence presented by the prosecution was circumstantial, and no direct evidence established Guthrie was even at the scene of the crime.

41

A. *Legal Principles*

In reviewing the sufficiency of the evidence to support a jury's verdict finding a defendant guilty of a criminal offense, we apply the substantial evidence standard of review. (*People v. Johnson* (1980) 26 Cal.3d 557, 575-579.) "Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the whole record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261.)

"The testimony of one witness, if believed, may be sufficient to prove any fact. (Evid. Code, § 411.)" (*People v. Rasmuson* (2006) 145 Cal.App.4th 1487, 1508.) "Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved. 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " '

42

[Citation.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 139; see *People v. Mobley* (1999) 72 Cal.App.4th 761, 788-789.)

"Whether a particular inference can be drawn from the evidence is question of law." (*People v. Austin* (1994) 23 Cal.App.4th 1596, 1604.) " 'An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action.' (Evid. Code, § 600, subd. (b).) However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." [Citation.]' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

B. *Analysis*

A person aids and abets the commission of a crime when he acts with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of encouraging or facilitating the commission of the crime, and his act or advice in some manner aids, promotes, encourages or instigates the commission of the crime. (*People v. Beeman* (1984) 35 Cal.3d 547, 560-561.) "Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.) To establish liability as a coconspirator, the prosecutor must prove the defendant intended to and agreed with a coconspirator to commit a crime, and that one member of the conspiracy committed an overt act to accomplish the crime. (*People v. Williams* (2008) 161 Cal.App.4th 705, 710.)

43

Guthrie argues reversal is required because the prosecution failed to present sufficient evidence to support the conviction under either theory. Guthrie asserts the Attorney General can only point to five types of evidence, none of which establish his involvement in Canady's murder: (1) Guthrie's pretrial statements to police, (2) Guthrie's relationship with Grant, (3) Guthrie's knowledge of Grant's motive to murder Canady, (4) Guthrie's presence near the murder scene, and (5) Guthrie's contacts with Johnson in the time surrounding the murder. Guthrie's characterization of the evidence as insufficient, however, is not supported by the record before this court.

As Guthrie argues, his close relationship with Grant and his knowledge of the motive and the crime, standing alone, do not establish his involvement in the crime. Other facts, however, are sufficient to support the jury's verdict. This evidence included the cell phone records placing Guthrie at the scene the day before the murder, cell phone records showing Guthrie was on the phone with Johnson seconds before the shooting and seconds after Canady is seen on the video surveillance footage coming outside of the barbershop (confirming his presence there), records showing Guthrie on the phone with Johnson shortly after the shooting and showing his movement away from the scene at the same time Johnson was moving away, and video footage of a man meeting Guthrie's physical characteristics and shadow boxing serving as lookout and support for Johnson at the scene.

As Guthrie notes, the "prosecution's case hinged on its ability to prove [Guthrie] was one of the two men in front of Nu's Auto Repair." Viewing the evidence before the jury—particularly the cell phone records and video footage—in the light most favorable

44

to the judgment, there was sufficient evidence to support the jury's finding that Guthrie was one of those men. In addition, Guthrie's assertions (1) that the evidence against him was only circumstantial and (2) that circumstantial evidence alone cannot be sufficient as a matter of law are both inaccurate. The cell phone records constituted direct evidence of Guthrie's communications with Johnson at the scene of the murder. (See Evid. Code, § 410 [" 'direct evidence' means evidence that directly proves a fact, without an inference or presumption, and which in itself, if true, conclusively establishes that fact"].)

Further, that the verdict rested on circumstantial evidence does not warrant reversal. " '[T]he appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] This standard applies whether direct or circumstantial evidence is involved. 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' [Citation.]" (*People v. Catlin, supra,* 26 Cal.4th at p. 139; see *People v. Mobley, supra,* 72 Cal.App.4th at pp. 788-789.)

While no witness confirmed that one of the two accomplices seen in the video surveillance footage was Guthrie, the video footage combined with the cell phone evidence showing Guthrie's involvement with Johnson (and to a lesser extent the

45

testimony that Guthrie was a former boxer), amply supported the inference that Guthrie was one of Johnson's accomplices. (See *People v. Campbell* (1994) 25 Cal.App.4th 402, 409 [" '[A]mong the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' "].) In sum, there was sufficient evidence to support the jury's finding that Guthrie knowingly and willingly participated in the murder of Canady.

VI

*Canady's Rap Lyrics*

Guthrie next contends the trial court abused its discretion by admitting into evidence a rap song recorded by Canady before his death. The prosecution argued the song was evidence of the defendants' motive to kill Canady.

A. *Relevant Background*

The prosecution moved to admit statements made by Canady that he had "stolen marijuana worth $250,000" from Grant and that he slept with Martin. The district attorney argued the statements, one of which was the rap song, were relevant to prove motive and the identity of the perpetrator. The prosecutor also asserted the statements were admissible hearsay because they were declarations against interest.

In response, Guthrie argued "people take creative license with songs" and the statements, therefore, were not "[a] reliable indicia of any facts." Guthrie's counsel argued the statements should not be admitted because Canady could not be cross-examined. He also argued it was not clear what the meaning of the lyrics were, so there was no way to determine whether the lyrics constituted a statement against penal interest.

46

The trial court found the evidence was relevant to show motive and identity, and that the statements were hearsay but admissible under the exception for statements against penal interest. The court acknowledged the lyrics were subject to interpretation, but found this "goes to the weight, not the admissibility." The court also ruled Evidence Code section 352 did not require exclusion of the statements.

During trial, the prosecution introduced the lyrics of Canady's song found on his cell phone. The lyrics matched portions of a recorded song titled "Don't Threaten My Life," which officers found on a CD obtained after Canady's death. The prosecution played the song for the jury and provided them with a transcript of the lyrics. The lyrics included passages in which Canady rapped that if his life was threatened, the instigator should be "ready to die," and that his enemies were plotting to kill him. Other passages seemed to refer to his affair with Martin: "Soon as I let off this chopper your girl gon' call the boys. She got my name all in a twist. Do your investigation just don't trust your bitch. She got them killas in your house fuckin' on your couch. Fuckin' on your bed. Fuckin' up your head. Kissin' my pinky ring when she saw them rocks. . . . If she ain't ridin' foreign then her life is borin'. Said you ain't scorin' if she ain't Chanel, Christian, Diorin'. Just 'cause I'm paid in full don't mean that I won't bang the tool. Boy, I know you a rude boy. But your bitch actin' a fool boy. Light and 'cush, you bees' watchin' my movies. We the cartel savages. Gold plated oozi's. . . ."

During his testimony, Avalos explained that Canady's reference to "I'm in the west" was acknowledging his membership in the West Coast Crips, while "lighting cush doobies" referred to smoking marijuana. He also explained that Canady's use of the

47

phrase "trap it out" and his self-identification as "cartel savages with gold-plated Uzis" were narcotics trafficking references. Avalos stated other terms used in the song referred to street robberies and threats to kill anyone that attempted to hurt him.

During closing arguments for Guthrie's jury, the prosecutor referred to the song once, repeating Canady's lyric " 'you ain't scoring if [you] ain't Chanel [and] Christian Dioring,' " while discussing Guthrie's motivation for being involved in the crime. Guthrie's counsel's closing argument also referenced the lyrics, stating, "Canady taunted [Grant] with that rap song. Come kill me. I'm ready for you. This is life on the streets. And Omar [Grant] went and had him killed. But he did not involve Ian Guthrie in this."

B. *Legal Principles and Analysis*

As discussed, the admission of evidence is governed by Evidence Code sections 210, 351, and 352. All relevant evidence is admissible, unless excluded by statute. (Evid. Code, § 351.) Relevant evidence, however, may be excluded by the trial court if its "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id*., § 352.) "We review a trial court's decision to exclude evidence for abuse of discretion. (*People v. Linton*, [*supra*, 56 Cal.4th at p. 1181].) The decision to exclude evidence 'will not be disturbed except on a showing [that] the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation].' " (*People v. Peoples*, *supra*, 62 Cal.4th at p. 745.)

Guthrie contends the rap lyrics were not relevant to the case because they contained no information that was specific to Canady's murder. He argues upon hearing the rap, the "jury was left to engage in pure speculation that the lyrics might be talking about Grant and Talya, might be talking about Canady's theft of Grant's marijuana, might be talking about his affair with Grant's girlfriend, and might be talking about Canady's awareness that Grant might retaliate." Guthrie also asserts the rap lyrics were not probative because they were cumulative to other evidence introduced by the prosecution.

We disagree with Guthrie's assertions. The lyrics were relevant to the prosecution's theory of the case, particularly the defendants' motive to seek revenge for Canady's theft and relationship with Martin. The lyrics tended to show that Canady was engaged in conduct that could provoke retaliation by Grant. Specifically, Canady's lyrics included statements about making money by selling drugs stolen from a girl who couldn't be trusted and that the theft was from "rude boys" and "Jack boys," slang parlance for Jamaicans. A trial court has wide latitude to admit evidence relevant to motive (*People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550) and Canady's lyrics did not fall outside this broad discretion.

Further, Guthrie has not explained why the lyrics were inflammatory or prejudicial to his defense, instead focusing narrowly on the relevance of the lyrics and their ambiguity. Thus, even if the evidence's probative value was relatively low, Guthrie has failed to show that their relevance was outweighed by the probability of prejudicial effect. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 609 ["Unless these dangers

49

'substantially outweigh' probative value, the objection must be overruled."].)  Guthrie has not shown the trial court abused its discretion in admitting this evidence.

VII

*Motion for Continuance to Conduct Discovery Concerning Use of Cell Site Simulator*

Guthrie next asserts that the trial court's denial of his motion to continue the sentencing hearing constituted an abuse of discretion and resulted in the violation of his rights to due process, effective assistance of counsel, and a fair trial.  Guthrie sought a continuance to conduct additional discovery to determine whether investigators used a technology called a cell site simulator to locate him.[13]  The Attorney General responds that Guthrie's claim lacks merit because (1) the postconviction motion for a continuance was repetitive of a motion in limine the trial court considered and properly denied; (2) if the cell site simulator was used, it fell within the scope of the warrants obtained by police; and (3) Guthrie's new accusation that the technology could have been used to obtain the content of cellular communications is baseless.

A. *Relevant Background*

On July 22, 2014, the San Diego Police Department collaborated with the FBI's Violent Crimes Task Force (VCTF) to obtain search warrants seeking call detail records and cell site data from Cricket and Verizon for the "832" and "619" mobile phone

---

[13]     "A cell-site simulator—sometimes referred to as a 'StingRay,' 'Hailstorm,' or 'TriggerFish'—is a device that locates cell phones by mimicking the service provider's cell tower (or 'cell site') and forcing cell phones to transmit 'pings' to the simulator.  The device then calculates the strength of the 'pings' until the target phone is pinpointed." (*United States v. Lambis* (S.D.N.Y. 2016) 197 F.Supp.3d 606, 609.)

50

numbers that were used by Johnson and Guthrie to communicate to each other. One of the search warrants authorized " 'all activation and monitoring of a tracking device and ongoing disclosure of location information, including cell site locations and Global Position Satellite ('GPS') coordinates, also known as 'pinging', including, but not limited, to cell site location utilized at call initiation and call termination, real-time Global Positioning System ('GPS') coordinates location of the handset, latitude and longitude, E911 location data, and call progress locations . . . , and for government agents to monitor the tracking devices, and subscriber information for a period of 30 days.' "

With respect to those two mobile numbers, the trial court authorized an additional search warrant to " 'download and forensically examine all contents of any such phone or device in order to obtain active or deleted data including but not limited to phone directories, contact information, identifying information, photographs, videos, call data, sent and received emails, SMS/text messages, access to social media sites such as Facebook, Twitter, Social, and Instagram posts, or other digital communication, data access times and locations, GPS information for posts, photos, and any other stored location information. . . .' "

Using cell phone data they believed was authorized by the warrants, VCTF agents tracked Guthrie's 619 number to the area around 9881 Via Monzon. The agents then began surveillance in the surrounding vicinity and eventually observed Guthrie using the 619 mobile device through an open garage door. The officers later confirmed that 9881 Via Monzon was Guthrie's residence. VCTF agents used a similar process to determine Johnson's location in Kansas City, Missouri. Law enforcement authorities

51

never accessed recorded conversations, text messages, or other communications from defendants' phones.

Guthrie and Johnson moved in limine to suppress evidence and for additional discovery regarding the cell phone tracking devices. Guthrie's attorney asserted that based on the discovery of his client's cell phone records, he suspected a cell site simulator was used to find Guthrie's location and that the use of such a device was not encompassed by the warrant issued by the court. Defense counsel argued they had requested this information from the prosecution, but the district attorney refused to confirm or deny that a cell site simulator had been used in the investigation. Guthrie's counsel agreed with the trial court that "the current state of federal [and state] law would allow, at least upon a showing of probable cause, a court to issue a warrant to allow the capture of prospective or real-time cell site information." Guthrie's attorney also conceded the court had the ability to issue a warrant to allow law enforcement to use such a device, but argued the court could not do so unless law enforcement provided the court with clear information about the device it intended to use, which had not occurred in this case.

In response to the arguments of defense counsel, the district attorney asserted the warrants that were issued by the court in this case were broad enough to include the use of the cell site simulator because they requested global positioning satellite (GPS) information, which can tell law enforcement "specifically where somebody is at a certain point in time." Guthrie's counsel argued that if the device was used, Guthrie's address was obtained by searching the Via Monzon home without a valid warrant. At the

conclusion of the hearing, the court ordered an in camera hearing to determine whether the cell site simulator was used.

After conducting the in camera inquiry, the trial court found the search did not exceed the scope of the authorized warrants and denied the motion for a continuance to conduct additional discovery. The trial court reasoned that the authorized warrants allowed the use of "any electronic device that permits the tracking of a person or an object, including, . . . inside the person's home." The court explained, "when the court issues a search warrant for a house for the police to go in, whether it is a homicide scene or a drug scene or whatever it might be, the court doesn't tell the police officers how to execute it. The officers get to execute it, provided it doesn't shock the conscience of the court and complies otherwise with the fourth amendment jurisprudence, however they want. I think the same thing is applicable here. The court authorized the seizure of the information that was seized. The officers, the state agents executed that in the way that they executed it. There was no seizure outside the scope of the warrant." The court agreed with the prosecution that if the cell site simulator was used, its use was authorized by the warrants that were issued.

Guthrie and Johnson filed a separate motion to suppress the evidence found at the Via Monzon residence, arguing again that any cell site simulator signals captured from within the residence violated their constitutional rights. The trial court denied that motion, again concluding that if a cell site simulator was used, it did not exceed the scope of the warrants.

During trial, after the testimony of the FBI agent who assisted with the cell phone aspect of the investigation, Guthrie's counsel moved for a mistrial. Guthrie's attorney argued his client was unfairly prejudiced because the use of the cell site simulator, which allowed law enforcement to locate Guthrie with precision, would cause the jury to conclude Guthrie was near the scene of the crime on the day of the murder even though the type of cellular data used to show this fact was not as precise as the cell site simulator technology. The court denied the motion, reiterating he had considered the issue before trial and continued to find that the "the search warrants that were issued authorized the capture of the [GPS] coordinates" using the cell site simulator technology.

After the verdict, but prior to sentencing, Guthrie and Johnson moved jointly to continue sentencing "to allow for further discovery concerning the San Diego Police Department's unauthorized use of cell site simulators, as described herein, during the investigation into Lamar Canady's death." In the alternative, the defendants moved for a new trial pursuant to section 1181 subdivision (5). Guthrie and Johnson asserted that the court and the defense were "deceived into believing surveillance performed during the investigation into Lamar Canady's death was restricted to pen-register, trap-and-trace, and geological tracking devices," which "directly resulted in deprivation of the defendants' rights to a fair trial . . . ." The defendants asserted the devices were designed "to eavesdrop, record, and possibly alter a target's intercepted communications."

Guthrie asserted additional discovery was warranted because the timing of the warrants suggested that police had conducted "illegal call and text message eavesdropping" and suggested "widespread prosecutorial misconduct and illegal

54

surveillance practices by the SDPD and District Attorney's Office."  Guthrie conceded that "the Stingray Warrants arguably authorized the SDPD to use some of [the cell-site simulator's] functions . . . ."  He contended, however, that because the cell site simulators might have the ability to engage in content-based eavesdropping, the authorities here engaged in it.

When the trial court asked for the evidence of such eavesdropping, defense counsel admitted that they did not have such evidence and they were "asking for . . . the continuance to obtain that."  Without any supporting evidence, Guthrie asserted the trial court had somehow been misled about the nature of the tracking device and contended that law enforcement authorities had illegally gathered voice and written communications that went beyond the parameters of the four search warrants issued in the case.

The court denied the motion for a continuance and the motion for a new trial.  The trial court found that the People had not used any tracking device to "access or record conversations, text messages or other communications from a mobile phone."  The court concluded, for the third time, that even if a cell site simulator was used, its use was permitted by valid warrants.

B. *Legal Standards*

A continuance of a criminal trial may be granted only for good cause, and the trial court has broad discretion to determine whether good cause exists.  (§ 1050, subd. (e); *People v. Alexander* (2010) 49 Cal.4th 846, 934.)  This court thus reviews a trial court's denial of a motion for a continuance for abuse of discretion.  (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118.)  " 'There are no mechanical tests for deciding when a denial of a

55

continuance is so arbitrary as to violate due process.' " (*Ibid.*) "In determining whether a denial was so arbitrary as to deny due process, the appellate court looks to the circumstances of each case and to the reasons presented for the request." (*People v. Frye* (1998) 18 Cal.4th 894, 1013.)

C. *Analysis*

Guthrie contends that the trial court's denial of his motion for a continuance to conduct additional discovery was an abuse of discretion because there was evidence that his Fourth Amendment rights might have been violated by investigators' use of a cell site simulator. He asserts there would have been no detriment caused by granting the continuance to seek additional discovery about the use of the cell site simulator. In response, the Attorney General argues that Guthrie failed to show good cause for the requested continuance. We agree.

The postverdict motion sought time to conduct the same discovery that Guthrie and Johnson requested before trial. In their motion in limine, defendants asserted the same arguments that Guthrie repeated in his postverdict motion for a continuance. In response to the motion in limine, the trial court conducted a full hearing, including an in camera evidentiary proceeding to address whether investigators used a cell site simulator to engage in surveillance of the content of Guthrie's cell phone communications. The court concluded that no such content surveillance had occurred, and found that the cell site technology, which allowed police to narrow the geographic location of Guthrie's phone, fell within the scope of the warrants issued by the court during the investigation.

56

The trial court's determination that Guthrie had not shown good cause for a continuance did not constitute an abuse of the court's discretion. Importantly, Guthrie did not provide any new information suggesting that the methods used by investigators were outside the ambit of the validly issued warrants. Further, as requested by Guthrie, we have reviewed the sealed transcripts of the in camera proceedings conducted by the trial court, and the evidence confirms the technology used by investigators to locate the cell phone conformed with the warrants issued by the court and that no content-based surveillance occurred.[14] In sum, Guthrie has not shown the court abused its wide discretion to deny his motion for continuance.[15]

## VIII

### *Senate Bills 620 & 1393*

Johnson's sentence includes an enhancement of 25 years to life under section 12022.53 for the personal use of a firearm causing death. While this matter was pending, we granted Johnson's motion to file a supplemental brief to address the impact of Senate Bill 620, which took effect on January 1, 2018, and provides trial courts with discretion to strike firearm enhancements under sections 12022.5 and 12022.53. (See §§ 12022.5, subd. (c) and 12022.53, subd. (h).) As Johnson points out, these subdivisions were not effective at the time he was sentenced and the trial court, therefore, did not have

---

[14] On June 8, 2017, this court granted Guthrie's unopposed motion to review the sealed transcript of the in camera proceeding filed simultaneously with his opening brief.

[15] Having concluded there was no error as to any of the issues raised by Guthrie, we need not address his claim of cumulative error.

discretion to strike the firearm use enhancement. He asserts Senate Bill 620 should be applied retroactively and we should remand this matter to allow the superior court to consider striking his firearm use enhancement.

As noted, Johnson and Guthrie both sought review of this court's initial opinion in the Supreme Court. The Supreme Court denied Johnson's petition, but granted Guthrie's and remanded to this court to consider Senate Bill 1393, which took effect on January 1, 2019 and amends sections 667, subdivision (a) and 1385 to give trial courts discretion at sentencing to strike five-year prior serious felony enhancements in "furtherance of justice." (Stats. 2018, ch. 1013, §§ 1-2.) Like the amendments made by Senate Bill 620, the modified provisions were not effective at the time Guthrie was sentenced and the court did not have discretion to strike the prior serious felony enhancement.

In its supplemental briefs, the Attorney General concedes *People v. Francis* (1969) 71 Cal.2d 66 (*Francis*) is controlling and requires retroactive application of both sentencing law changes to all nonfinal judgments. In *Francis*, the defendant was charged with selling and giving away marijuana. (*Id*. at pp. 69-70.) The matter was tried to the court and submitted on the preliminary examination transcript. (*Id*. at p. 70.) The court found defendant guilty of possession of marijuana as a lesser included offense. (*Ibid.*) At the time of the defendant's sentencing, possession of marijuana was punishable by a term of one to 10 years in prison. The court also had the authority to grant the defendant probation and require him to serve time in the county jail as a condition of probation. (*Id*. at p. 75.) The trial court sentenced the defendant to state prison. (*Id*. at p. 70.) After his conviction, but prior to the conclusion of his appeal, the Legislature amended the Health

58

and Safety Code, authorizing a trial court to reduce a conviction for possession of marijuana to a misdemeanor, punishable by a term in county jail.  (*Ibid.*)

The court held the amendment should be given retroactive effect pursuant to *In re Estrada* (1965) 63 Cal.2d 740.  (*Francis, supra*, 71 Cal.2d at pp. 75-76.)  In arguing against remand, the People noted the trial court rejected the idea of placing the defendant on probation and to impose county jail time as a condition of probation.  (*Id*. at p. 76.)  In rejecting that contention, the court stated, "the mere fact that the Legislature changed the offense from a felony to a felony-misdemeanor conceivably might cause a trial court to impose a county jail term or grant probation in a case where before the amendment the court denied probation to a defendant eligible therefor and sentenced the defendant to prison."  (*Id*. at p. 77.)

The Attorney General concedes, and we agree, the same reasoning applies in the instant case and section 12022.53, subdivision (h) and amended section 667, subdivision (a) should be applied retroactively.  However, the Attorney General argues remand is not necessary because the record demonstrates the trial court would have sentenced Johnson and Guthrie no differently even if it had the discretion to strike the enhancements.

We need not remand the instant matter if the record shows that the superior court "would not . . . have exercised its discretion to lessen the sentence."  (See *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896.)  The People contend the sentences imposed by the trial court below combined with the court's comments at sentencing show the court would not have exercised its discretion to strike the firearm enhancement applied to Johnson or the serious prior felony enhancement applied to Guthrie.  With

59

respect to Johnson, the Attorney General points out that the trial court stated that the enhancement, which was mandatory at that time, "appears to me to be entirely appropriate." With respect to Guthrie, the Attorney General points to the court's statement that it "ha[d] no discretion to strike" the serious prior and "wouldn't strike if [it] did have discretion." The People also point out that in concluding dismissal of the defendants' prior strikes was not appropriate, the court noted the murder was a sophisticated, planned execution, that the men committed the crime despite having no personal motive to kill Canady, and that they were both previously convicted of murder.

Although the trial court was not sympathetic to either Johnson or Guthrie, it is undisputed that the court had no discretion, at that time, to strike the firearm use enhancement or the serious prior felony enhancement, and neither defendants' trial counsel had the opportunity to argue the issues. The subsequently enacted laws provided the court with that discretion, greatly modifying the court's sentencing authority. Thus, even with the court's statements during sentencing, out of an abundance of caution, we remand this matter for resentencing to allow the superior court to consider whether Johnson's firearm enhancement and Guthrie's serious prior felony enhancement should be stricken.

## DISPOSITION

This matter is remanded to allow the superior court to consider whether Johnson's firearm use enhancement and Guthrie's serious prior felony enhancement should be stricken. In all other respects, we affirm the judgments.

60

NARES, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.